IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | MO-O9-CR-238 |
| | ) | |
| | ) | |
| VS. | ) | Suppression Hearing |
| | ) | |
| | ) | |
| JOHN CHRISTOPHER BRUNSON | ) | January 14, 2010 |

BEFORE THE HONORABLE ROBERT JUNELL
UNITED STATES DISTRICT JUDGE
In Midland, Texas

FOR THE GOVERNMENT:          MS. KERRY A. FLECK
                             Assistant United States Attorney
                             400 W. Illinois, Suite 1200
                             Midland, Texas  79701
                             (432) 686-4110

FOR THE DEFENDANT:           MR. DAMIAN CASTILLO
                             Law Offices of Roy Scott
                             407 N. Big Spring, Suite 200
                             Midland, Texas  79701
                             (432) 570-9979

COURT REPORTER:              MR. TODD ANDERSON, RMR, CRR
                             United States Court Reporter
                             200 E. Wall, Rm. 116
                             Midland, Texas  79701
                             (432) 686-0605

    The above-styled and numbered cause was reported by

mechanical stenography and produced by computer.

INDEX

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|

WITNESS FOR THE
DEFENDANT

| | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| JUANITA SANTANA | 4 | 17 | 23 | 26 | 27 |

ARGUMENT: Mr. Castillo................................. 28

ARGUMENT: Ms. Fleck................................... 31

Court's ruling........................................ 34

GOVERNMENT'S EXHIBITS

| | | Marked | Received |
|---|---|---|---|
| 1 | Search Warrant, etc. | 26 | 27 |

1          (January 14, 2010)

2          (Defendant present)

3          THE COURT:  Clerk, call the case, please.

4          THE CLERK:  The Court calls MO-O9-CR-238, the United

5    States of America versus John Christopher Brunson.

6          MS. FLECK:  Kerry Fleck on behalf of the Government.

7          MR. CASTILLO:  Damian Castillo on behalf of the

8    Defendant.  We are present and ready.

9          THE COURT:  Mr. Brunson, can I get you to stand up

10   for just a second?

11         Would you state your name for me, please?

12         THE DEFENDANT:  John Christopher Brunson.

13         THE COURT:  And, Mr. Brunson, you're the Defendant in

14   this case?

15         THE DEFENDANT:  Yes, Your Honor.

16         THE COURT:  And you understand we're here today on a

17   motion filed by your attorney to suppress evidence seized in

18   your home pursuant to a search warrant that was executed on

19   September 3, 2009?

20         THE DEFENDANT:  Yes, Your Honor.

21         THE COURT:  Okay.  Thank you very much.  You can be

22   seated.

23         Mr. Castillo, there was a search warrant, so you've

24   got the burden, so be glad to -- are you going to call any

25   witnesses?  Do you want to -- what would you like to do?

1          MR. CASTILLO:  I will call one witness, the agent --

2          THE COURT:  Okay.

3          MR. CASTILLO:  -- that was in charge.

4          THE COURT:  All right.

5          MR. CASTILLO:  So I would call Ms. Santana to the

6     stand.

7          THE COURT:  Ms. Santana, would you come up, please,

8     ma'am, and let Mrs. LaForge swear you as a witness?

9          (Pause)

10          THE CLERK:  If you will raise your right hand.

11          (The witness was sworn)

12          THE CLERK:  Have a seat right there.

13          THE WITNESS:  Thank you.

14          THE COURT:  Mr. Castillo, you may proceed.

15          JUANITA SANTANA, DEFENDANT'S WITNESS, SWORN

16                    DIRECT EXAMINATION

17     BY MR. CASTILLO:

18     Q.   Good afternoon.  Would you state your name, please?

19     A.   Juanita Santana.

20     Q.   And, Ms. Santana, how are you employed?

21     A.   I am a special agent with Immigration and Customs

22     Enforcement.

23     Q.   And were you the agent in charge over the John Brunson

24     case, the case we're here for today?

25     A.   Yes, I am the case agent.

1    Q.    Okay.  And were you also in charge of the preliminary

2    investigations of this case before Mr. Brunson was arrested?

3    A.    Yes, sir.

4    Q.    And you also requested that a search warrant be executed

5    for -- was alleged to be Mr. Brunson's residence; is that

6    correct?

7    A.    That's correct.

8    Q.    Okay.  And was that this 5757 Long Avenue?

9    A.    That's correct.

10   Q.    At the time you requested that search warrant, did you

11   provide the magistrate with an affidavit?

12   A.    Yes, I did.

13   Q.    Was there any hearing held before the magistrate?

14   A.    No, sir.

15   Q.    Okay.  So the evidence provided was the affidavit?

16   A.    Yes, sir, and photographs of the residence.

17   Q.    And photographs of the residence.

18         Okay.  In your investigation and in the affidavit

19   presented to the magistrate judge, you listed several different

20   names, one being Alan Clarke and the other one Chris Howell?

21   A.    That's correct.

22   Q.    Who did you identify to be Alan Clarke?

23   A.    Alan Clarke is the complainant who initially contacted the

24   Royal Canadian Mounted Police referencing the conversation he

25   had in a chat room with Chris Howell.

1   Q.   Did Alan Clarke provide you a transcript of that online

2   communication?

3   A.   He provided the Royal Canadian Mounties with copies of the

4   chat log and photographs that were transmitted via the web cam

5   from Howell to him.

6   Q.   Do you know if that chat log was complete or was only

7   partial or part of the communication that they had online?

8   A.   We received three pages.  And when you read the chat log,

9   you can tell the conversation had already started.

10           MR. CASTILLO:  Your Honor, may I approach the witness

11  to hand her a copy of that chat log?

12           THE COURT:  You may.

13           MR. CASTILLO:  Thank you.

14  BY MR. CASTILLO:

15  Q.   Let me show you some of the discovery that I received in

16  the case.

17  A.   Yes.

18  Q.   You can look through those pages and tell me if that's the

19  chat log.

20  A.   Yes, this is what I recognize as the chat log.

21  Q.   Okay.  And I notice that there's -- seems like two

22  different users online.

23  A.   That's correct.

24  Q.   And do you know who these two users were identified as?

25  A.   Well, the first user is Alan Clarke, who was at the time

1    posing as a female.  And the second one is Chris Howell, who

2    was subsequently identified as John Christopher Brunson.

3    Q.   Okay.  So Alan Clarke, you said, was posing as a female?

4    A.   That's correct.

5    Q.   During part of this conversation, were they on the web

6    cam?

7    A.   Yes.

8    Q.   You put that in your affidavit?

9    A.   Yes.

10   Q.   And on that web cam did Mr. Clarke say he could see the

11   person on the other side?

12   A.   Yes.

13   Q.   Okay.  And did he print out some sort of photo shot from

14   that program?

15   A.   He printed two photos, yes.

16   Q.   Did he say whether Mr. Brunson could see him from his

17   side?

18   A.   Yes.  During the interview he did with constables, he

19   stated that he was feeding into the web cam video of a female,

20   that he is very computer knowledgeable, and that is what he was

21   doing.

22   Q.   Okay.  So, apparently, you can feed onto the computer the

23   image of someone else.  Does it look like a live image?  Do you

24   know?

25   A.   It appears so.

1    Q.    And so what Mr. Brunson could see, according to

2    Mr. Clarke, was a female?

3    A.    That's correct.

4    Q.    And what Alan Clarke was seeing was allegedly Mr. Brunson?

5    A.    That's correct.

6    Q.    Okay.  And was that in your affidavit?

7    A.    Yes.

8    Q.    All right.  On this chat conversation here, it looks like

9    it starts off with Alan Clarke saying, "How young is Young

10   West?"

11   A.    That's correct.

12   Q.    Is that correct?

13   A.    Yes.

14   Q.    So it looks like there is a part of this cut off?

15   A.    It appears as if he started recording it, saving it after

16   the fact, after he had already started.

17   Q.    Okay.  And I noticed in the affidavit provided to the

18   magistrate there seems to be a statement in there that says

19   that he had performed acts previously?

20   A.    Yes.

21   Q.    Okay.  But in this chat conversation there's -- I mean, is

22   there anything in there that says that acts had already been

23   performed?

24   A.    May I see it?

25   Q.    Sure.

1    A.    Thank you.

2          (Pause)

3    Q.    I guess my question is, the first part of the conversation

4    especially, because that's when the little girl is referenced,

5    doesn't it seem more to be referring to something that may

6    occur in the future as opposed to something that has already

7    occurred?

8    A.    It is something that is about to occur.  From the

9    interviews with Clarke and from reading the chat log, evidently

10   it's imminent that it's going to happen.  And the way that

11   Brunson discusses it, it looks as if it's a regular thing that

12   he does.

13   Q.    Okay.  But that's -- I mean, you're telling me what you've

14   discussed with Clarke.  Have you talked to Clarke personally?

15   Did you get the information from him to put in the affidavit?

16   A.    I got a recorded interview from the Mounties that was

17   turned over to our investigators in Vancouver, British

18   Columbia.  And I got the notes that they sent me.

19          THE COURT:  So the answer is no, you haven't spoken

20   to --

21          THE WITNESS:  To Clarke, no, sir.

22          THE COURT:  -- Clarke?

23   BY MR. CASTILLO:

24   Q.    Okay.  So just looking at that chat log, though, there is

25   no reference to any prior acts committed on this child; is that

1   correct?

2   A.    When Brunson, posing as Howell, said what the child can do

3   with him, one would infer that it has happened in the past.

4   And it's pretty graphic in nature in the chat.

5   Q.    Now, and your -- and the evidence that came from the

6   interview with Clarke and that chat log, did any act actually

7   occur during this online communication?

8   A.    No, it did not.

9   Q.    So during that -- what is it, about a three-minute

10  conversation?

11  A.    I don't know the length.

12  Q.    Okay.  Nothing refers other than that -- in reference to

13  the child other than that about maybe five or six different

14  lines of the parties going back and forth; is that correct?

15  A.    Yes.

16  Q.    Now, based on this information, is it correct that your

17  investigations eventually led you to the residence of the

18  Howells?

19  A.    Yes.

20  Q.    And who are the Howells?

21  A.    The Howells are Jeffrey Mark Howell and Marie Howell.

22  They were friends of John Christopher Brunson.  Marie Howell

23  dated Brunson in the ninth grade, and they are friends.

24  Q.    Okay.  And how did you get to the Howell residence?  What

25  led you there?

1    A.    Okay.  Very early on in the very early stages of the

2    investigation, we received from intelligence analysts the name

3    Chris Howell and several web pages that Chris Howell is

4    associated with as well as networking sites.

5              He has a profile listed as West Tex Dad, as a

6    31-year-old male living in Odessa.  Basically, he has profiles

7    maintained in Yahoo, MySpace, ANYwebcam, and Adult Space.

8    He --

9    Q.    Where -- I'm sorry.  Let me stop you there.  Where

10   eventually did you find that address that led you to the Howell

11   residence?

12   A.    Okay.  Chris Howell on his MySpace page, he has a patch

13   that it says "Permian Basin Airsoft."  By researching Permian

14   Basin Airsoft, we discovered a member by the name of John, John

15   who is Army Scout 31.  His profile is identical to Chris

16   Howell's profile.  Even the same typographical errors show in

17   both profiles.  They're both adult males out of Odessa.  John

18   has photographs of Jeffrey and Marie Howell in his profile.

19             We were able to establish who the Howells were, and

20   we paid them a visit.  Since we had the pictures from John's

21   MySpace page and Chris Howell's pictures that he fed to Alan

22   Clarke, we took both photographs to the Howells' residence and

23   pretty much asked them --

24   Q.    Let me stop you right there.  I apologize.

25   A.    Yes.

1   Q.   You say that they had the same typographical mistakes set

2   up on these sites.

3            On your affidavit didn't you say "similar," not the

4   same?

5   A.   Yes.  Similar and overlapping in nature, yes.

6   Q.   Okay.  And so the Howells -- which is the last name of the

7   person who was online was Howell; is that correct?

8   A.   That's correct.

9   Q.   Okay.

10  A.   That's the name he used.

11  Q.   And the address you picked up was the residence of Jeffrey

12  Howell and Marie Howell?

13  A.   That's correct.

14  Q.   Did you seek to obtain a search warrant for that residence

15  before you went to it?

16  A.   No.

17  Q.   Okay.  So you went to that residence and you met with the

18  Howells, and you showed them photo shots of what Mr. Alan

19  Clarke gave you; is that correct?

20  A.   Chris Howell fed him through the web cam, yes.

21  Q.   Okay.  That's what Mr. Clarke said?

22  A.   Yes.

23  Q.   All right.  And then the Howells -- and correct me if I'm

24  wrong, if I'm misstating your affidavit.  The Howells

25  identified the person in that shot as a John Brunson?

1    A.    That's correct.

2    Q.    And they referred you to a different address?

3    A.    Yes.

4    Q.    Okay.  Then that address -- was that address listed under

5    John Brunson?

6    A.    No.

7    Q.    Okay.  Was it listed under the name of Johnsons?

8    A.    Yes.

9    Q.    And did you do a property records search on that house?

10   A.    Yes.

11   Q.    Okay.  Is that where you found the Johnsons?

12   A.    Yes.

13   Q.    Did you attempt to find out or make contact who the

14   Johnsons were?

15   A.    No.

16   Q.    And when you prepared your affidavit, who prepared it?

17   A.    I did.

18   Q.    Okay.  Was it just based on your information, your

19   investigations?

20   A.    It's based on my information and the information

21   transferred to me by Jesse Miller, the agent in Vancouver,

22   British Columbia; information also obtained by the computer

23   forensic agent Heath Hardwick; and cooperative efforts through

24   surveillance on establishing the residence by other agents in

25   my office.

1    Q.    There was also a subpoena sent to Yahoo.com; is that
2    correct?
3    A.    Jesse Miller did that, yes.
4    Q.    What was obtained from Yahoo.com?
5    A.    Basically, that the user is Chris Howell out of Odessa, 33
6    years old, and that his user ID is West Tex Dad.
7    Q.    Was there an address?
8    A.    No.
9    Q.    Was there an IP address?
10   A.    There were several, yes.
11   Q.    Several IP addresses?
12   A.    (Indicating in the affirmative)
13   Q.    Did you check -- I noticed in your affidavit you give an
14   explanation of IP addresses and how they are unique and they
15   can point you to a residence.
16         Were you able to determine that based on this IP
17   address?  I know I asked you the same question at the detention
18   hearing, and I think you told me no; is that correct?
19   A.    That's correct.  We removed three computers out of the
20   Brunson residence.
21   Q.    Well, I'm talking about the IP address that you received
22   from Yahoo.com.  Were you able to link --
23   A.    That was received after the search warrant.  It is not
24   used in the affidavit.  That information is not used in the
25   affidavit.

1    Q.    Okay.   After you prepared your affidavit, where did you --

2    what did you do from there?  Where did you take it to get the

3    warrant?

4    A.    I came to the District Court to see the Judge to obtain

5    the warrant, yes.

6    Q.    Did you ever see any of the AUSA's?

7    A.    Yes.   I saw John Klassen the night before.

8    Q.    John Klassen?

9    A.    Yes.

10   Q.    Did he look at the affidavit?

11   A.    Yes.

12   Q.    You e-mailed it to him, faxed it to him?

13   A.    I actually met him at a baseball game.

14   Q.    Met him at a baseball game?

15   A.    (Indicating in the affirmative)

16   Q.    You also stated in your affidavit that storage devices,

17   modems, all sorts of computer devices can store -- they are

18   unique.   They can store thousands and thousands of pages of

19   information; is that correct?

20   A.    That's correct.

21   Q.    And in there you put an Attachment B.  Do you remember

22   that Attachment B?

23   A.    Yes.   May I look at it?

24   Q.    Sure.

25   A.    Thank you.

1          (Pause)

2    Q.    Okay.  You prepared this?

3    A.    Yes, I did.

4    Q.    All right.  The first paragraph seems to refer to the

5    statutory section for production of child pornography; is that

6    correct?

7    A.    We were initially pursuing an attempt at producing the

8    child pornography.

9    Q.    Okay.  Then you get into the second and third paragraphs

10   which I just -- I guess are -- it seems like quite a few things

11   that are related to computers?

12   A.    Yes.

13   Q.    All right.  These type of devices, are these -- the ones

14   listed in here, are these the kind that can store thousands and

15   thousands of pages of information and all sorts of data about a

16   person?

17   A.    Yes, sir.

18   Q.    I noticed in here that you didn't put any limits as to

19   maybe just images or photographs.  Was that purposeful?

20   A.    Basically, the format that we use when we are pursuing

21   computer related crimes.

22   Q.    So this language in here is just generated somewhere and

23   spit onto the page through a computer?

24   A.    Yes.  Uh-huh.

25   Q.    Did you modify this in any way, or was this all just kind

1    of standard language from a program?

2    A.    I might have just added the respective section of the law.

3              MR. CASTILLO:  I pass the witness.

4              THE COURT:  Ms. Fleck.

5                        CROSS-EXAMINATION

6    BY MS. FLECK:

7    Q.    Okay.  Good afternoon, Agent Santana.

8    A.    Good afternoon.

9    Q.    Let's talk about Attachment B real quick.  You mentioned

10   this is language that you use in a lot of search warrants

11   dealing with computers with cyber crimes; is that correct?

12   A.    Yes, ma'am.

13   Q.    And you reviewed this language to be sure it applied

14   specifically to this case, didn't you?

15   A.    That's correct.

16   Q.    And you also brought Attachment B along with the rest of

17   the warrant application and affidavit to John Klassen with the

18   U.S. Attorney's Office to review and make sure it was

19   appropriate in this case as well, correct?

20   A.    Yes, ma'am.

21   Q.    And given the information that you knew, that Mr. Brunson

22   was speaking over a web chat using the Internet, that

23   information that was contained in Attachment B was appropriate

24   in your belief and with Mr. Klassen as far as you were

25   concerned, correct?

1  A.    Yes.

2  Q.    Now, let's talk about your affidavit.  And I know it

3  speaks for itself, so I will just go through it quickly.  But

4  you initially received a complaint from ICE up in Canada who,

5  in turn, had received a complaint from a citizen through the

6  Royal Canadian Mounted Patrol; is that correct?

7  A.    That's correct.

8  Q.    And you were given, unlike some cases, a photograph of the

9  person you were looking for rather than just following an IP

10  address, right?

11  A.    Yes, ma'am.

12  Q.    And you received part of a printout of the chat or the

13  conversation that the Defendant was having with this Canadian

14  citizen, correct?

15  A.    Yes, ma'am.

16  Q.    And part of that included the Defendant stating -- and I

17  quote -- "looking to get naughty with his three-year-old

18  daughter," correct?

19  A.    Yes, ma'am.

20  Q.    And you included that in your affidavit, right?

21  A.    Yes.

22  Q.    You also included Mr. Clarke, the Canadian citizen's

23  response, which was -- and I quote -- "What can a

24  three-year-old do with Daddy?"

25  A.    Yes, ma'am.

1    Q.    And that was also included in your affidavit, correct?

2    A.    Yes.

3    Q.    And then the Defendant, who at this point was identifying

4    himself as Chris Howell, right?

5    A.    Yes.

6    Q.    Replied, "She can play" -- and I quote -- "with Daddy's

7    big dick, and I can get her to suck me," correct?

8    A.    Yes, ma'am.

9    Q.    And Mr. Clarke relayed to law enforcement, which was then

10   relayed to you, that it was clear to him that Mr. Howell, as he

11   knew him at the time, was ready to engage in oral sex with the

12   child?

13   A.    Yes.

14   Q.    And that he was sure it was going to happen soon, correct?

15   A.    Yes, ma'am.

16   Q.    And that the child -- he actually saw a child that

17   appeared to be a three-year-old female child running around in

18   the background while this web cam is going on, correct?

19   A.    That's correct.

20   Q.    And you described all of that in your affidavit?

21   A.    Yes, ma'am.

22   Q.    And the child appeared to Mr. Clarke, as you put in your

23   affidavit, to be compliant and relaxed with her dad around this

24   web cam, correct?

25   A.    Yes, ma'am.

1  Q.    And Mr. Clarke relayed to law enforcement that he was

2  extremely concerned for the safety of the child, correct?

3  A.    Yes, ma'am.

4  Q.    And you were concerned with that child's safety, too,

5  weren't you?

6  A.    Yes.

7  Q.    In fact, what day did you receive this complaint from

8  Canada?

9  A.    I received the complaint on August 31st around 5:30 in the

10 afternoon.

11 Q.    And when were you able to put together this affidavit and

12 bring it to Mr. Klassen?

13 A.    We conducted the primary investigation rather quickly

14 because we wanted to rescue the child.  So I took the affidavit

15 on September 2nd to be reviewed, and on September 3rd we

16 obtained the search warrant and executed it.

17 Q.    And from August 31st to September 2nd, again, you had a

18 still photograph from the web cam of the perpetrator,

19 Christopher Howell, who you later learned to be John Brunson;

20 is that correct?

21 A.    Yes, ma'am.

22 Q.    And with that photograph, you were able to see who it is

23 you were looking for, right?

24 A.    That's correct.

25 Q.    And you actually tracked down Marie and Jeffrey Howell,

1  correct?

2  A.    Yes.

3  Q.    Were you able to verify by looking at Jeffrey Howell that

4  he wasn't the person that you had in the picture?

5  A.    Correct.

6  Q.    And Mr. Jeffrey Howell had two three-year-old children,

7  twins, at his house, right?

8  A.    That's correct.

9  Q.    Were you also able to verify by looking at those children,

10  the twins, that they weren't the three-year-old from the web

11  cam?

12  A.    Correct.

13  Q.    You also had a picture, I guess, of the three-year-old

14  from the web cam?

15  A.    Yes.

16  Q.    Is that right?

17  A.    Yes.

18  Q.    You also, prior to executing the search warrant or even

19  finalizing the affidavit, conducted surveillance of the

20  residence that the Howells told you Mr. Brunson lived in,

21  correct?

22  A.    That's correct.

23  Q.    And during the surveillance, you saw the Defendant John

24  Brunson leaving his residence and getting into his vehicle,

25  correct?

1    A.    That's correct.

2    Q.    And you included all of that information in your affidavit

3    as well?

4    A.    That's correct.

5    Q.    You were asked questions about subpoenas to Yahoo and IP

6    addresses.  Isn't it true that sometimes in this type of

7    investigation you utilize those tools as far as subpoenaing IP

8    addresses to locate a physical address where a computer user is

9    located; is that right?

10   A.    That's correct.

11   Q.    In this case, isn't it true that you didn't wait for those

12   subpoenas to be returned because you were in fear for the

13   safety of a three-year-old child?

14   A.    Yes, ma'am.

15   Q.    Did you believe that you were acting in good faith on a

16   valid search warrant in this case?

17   A.    Yes, ma'am.

18   Q.    And did you believe that you were acting in good faith to

19   save this three-year-old child?

20   A.    Yes, ma'am.

21   Q.    Did you at any time lie or mislead Judge Counts when you

22   showed him this search warrant application and affidavit?

23   A.    No, ma'am.

24   Q.    Did you believe that you had probable cause for the search

25   warrant?

1    A.    Yes, ma'am.

2    Q.    And by signing a search warrant, did you believe that

3    Judge Counts agreed with you?

4    A.    Yes, ma'am.

5    Q.    In fact, isn't it true that Judge Counts had to go back

6    and make some clarifications and changes to your affidavit

7    before he would sign it?

8    A.    That's correct.

9             MS. FLECK:  I have no further questions.

10            THE COURT:  Okay.  Mr. Castillo.

11                    REDIRECT EXAMINATION

12   BY MR. CASTILLO:

13   Q.    Agent Santana, the items on the list -- the items on the

14   inventory that were seized from the residence, do you remember

15   that list?

16   A.    Yes.

17   Q.    Or do you have it with you?

18   A.    No, I do not.

19   Q.    Okay.  I'll just quickly read them off, and tell me if you

20   remember these.  A Dell laptop, a Dell CPU, a modem, a router,

21   a CPU, Konica Minolta digital camera, a web cam, a 35

22   millimeter Polaroid camera with film, one Philips digital

23   camera, one black wallet with military ID badge, 14 adult

24   industry magazines, and one floppy drive and one card reader.

25   A.    That's correct.

1    Q.    Those were the items seized from the residence?

2    A.    Yes, sir.

3    Q.    Most of these seem to be computer related items.  There

4    are also some cameras taken and adult magazines?

5    A.    Yes, sir.

6    Q.    Were those items taken just based on your observations and

7    your determination at the scene --

8    A.    Yes.

9    Q.    -- that you should take those?

10   A.    Yes.

11   Q.    All right.  But they weren't listed specifically in the

12   affidavit nor the Attachment B; is that correct?

13   A.    The cameras were not nor the adult magazines.

14   Q.    All right.  Now, back to Mr. Clarke --

15   A.    Yes.

16   Q.    -- the person who gave a lot of the information that began

17   the search.

18         Did you ever do a background check on him to check

19   his reliability on the information he was giving you?

20   A.    No, I did not.

21   Q.    Not even considering he was posing as a female, according

22   to him?

23   A.    No.

24   Q.    And as far as their conversation, there were never any

25   images transmitted over the Internet, correct?

1    A.    The images transmitted through the web cam were the photos

2    of the child in her underwear running around in the background

3    and of Mr. Brunson.

4    Q.    Okay.  I mean by e-mail or, you know, through just an

5    actual photograph.  Was a photograph or something like that

6    ever transmitted?

7    A.    Not to my knowledge.

8    Q.    Okay.  So the only thing you're talking about is what

9    Mr. Clarke could see through the web cam and what the person

10   named as Howell, who led you to Mr. Brunson, could see through

11   his web cam?

12   A.    That's correct.

13   Q.    And you said you didn't wait on the subpoena from Yahoo.

14   When was that applied for?

15   A.    Jesse Miller applied for the subpoena very early on, the

16   very first couple of days within the week.  I don't even

17   remember the specific date, but he applied for it.

18   Q.    Before the warrant was obtained?

19   A.    Yes.

20   Q.    Do you know when the information came back from Yahoo?

21   A.    After the warrant had been served.

22   Q.    Like a day after?

23   A.    Probably a couple of days, yes.

24         MR. CASTILLO:  No more questions.

25         THE COURT:  Ms. Fleck?

1          MS. FLECK:  Just briefly.

2                    RECROSS-EXAMINATION

3    BY MS. FLECK:

4    Q.    Agent Santana, you were asked about items that were seized

5    during the search warrant.

6              Didn't forensic -- Special Agent Heath Hardwick, who

7    is trained in computer forensic, do a preview -- what we call a

8    preview of the computer at Mr. Brunson's residence?

9    A.    No preview was done.

10   Q.    He did not?  Okay.

11             Let's talk about the corroboration you had of

12   Mr. Clarke.  You didn't know Mr. Clarke, correct?

13   A.    No, ma'am.

14   Q.    But didn't you corroborate what he was saying or other law

15   enforcement officers did by taking the photograph of the

16   Defendant, the photograph of the child, as well as a copy of

17   the chat log which showed what they were talking about?

18   A.    Yes, ma'am.

19             (Government's Exhibit No. 1 marked)

20             MS. FLECK:  And, Your Honor, at this time I would

21   like to offer into evidence what I premarked as Government's

22   Exhibit 1, which is the search warrant, the application, as

23   well as the affidavit and attachments that were all presented

24   to Judge Counts in this case.

25             THE COURT:  Any objection?

1           MR. CASTILLO:  May I see them?

2           THE COURT:  You may.

3           (Pause)

4           MR. CASTILLO:  No objections.

5           MS. FLECK:  May I approach?

6           THE COURT:  Yeah.

7           Government's Exhibit 1 is admitted.

8               (Government's Exhibit No. 1 received)

9           MS. FLECK:  I have nothing else, Your Honor.

10          THE COURT:  Okay.  Anything else, Mr. Castillo, of

11      this witness?

12                    REDIRECT EXAMINATION

13      BY MR. CASTILLO:

14      Q.   The search warrant -- I may have asked you this.  But it

15      makes reference to Attachment B.  It doesn't make any reference

16      to Attachment A.

17               Is Attachment A considered your affidavit, or do you

18      know?

19      A.   Actually, Attachment A is the description of the premises

20      to be searched.

21      Q.   Okay.  Thank you.

22          MR. CASTILLO:  No more questions, Your Honor.

23          THE COURT:  Ms. Fleck?

24          MS. FLECK:  Nothing else.

25          THE COURT:  You can step down.  Thank you, Agent.

1    THE WITNESS:  Thank you, sir.

2    (Witness excused)

3    THE COURT:  Mr. Castillo, any other witnesses?

4    MR. CASTILLO:  I have no other witnesses, Your Honor.

5    I have a small closing argument.

6    THE COURT:  Ms. Fleck, any evidence that the

7    Government would like to put on?

8    MS. FLECK:  No, Your Honor.

9    THE COURT:  Mr. Castillo, be glad to hear from you on

10   argument.

11   MR. CASTILLO:  Your Honor, we did bring a motion to

12   suppress here and claiming a violation of the Defendant's

13   Fourth Amendment constitutional rights, specifically on two

14   issues.  One, that the evidence and specifically the affidavit

15   presented to the magistrate contained insufficient probable

16   cause to authorize issuing this warrant.  I believe the Courts

17   have looked to the totality of the circumstances and

18   specifically to the information in the affidavit to make this

19   determination.

20       If you look at the circumstances here, there was

21   information about a chat log conversation.  There were never

22   any images transmitted here.  The main point was that

23   Mr. Clarke was chatting with allegedly Mr. Brunson, and they

24   were talking about acts to be done.  There is testimony that

25   nothing was done and that it was acts that possibly were going

1   to occur in the future.

2           Also, the investigating officers based most of the

3   information that led them to the residence on the information

4   received from Mr. Clarke, which, again, in evidence stated that

5   he was posing as a female rather than himself.  And his

6   reliability was never really checked through a criminal

7   background check or through any other information.  There was

8   an interview done.  Based on some of that interview, there was

9   more notes put in the affidavit.  However, we question his

10  reliability.

11          When an address was obtained, it was the address of

12  the Howells, not the Defendant's.  No warrant was obtained

13  there.  They visited the residence and then took the word of

14  the Howells on what residence the Defendant resided in and

15  obtained a search warrant for that.  The property records

16  showed that the house belonged to the Johnsons.

17          As the agent testified, no communication was ever

18  sought of the Johnsons to see if John Brunson was residing

19  there, if he was related to them, if they were loaning him the

20  house.  And so we would question that part as not -- as another

21  reason for showing that insufficient probable cause existed.

22          In addition, the second point we bring, Your Honor,

23  is the particularity requirement in this warrant.  This

24  affidavit has two parts really to it.  The first part being the

25  general statutory language at the top stating that they are

1    seeking evidence of Section -- 18 U.S.C., Section 2251.  And

2    the second part being the two center paragraphs which to us

3    seem like just a general description of almost every computer

4    related technology there is out there.

5           As stated in the cases I cited in my motion, Your

6    Honor, and by the agent, you can store thousands and thousands

7    of pages of information in those kind of devices which contain

8    anything from child pornography to tax returns to eBay

9    transactions to any other related information.

10          Our concern is that this affidavit wasn't limited in

11   some way, for instance, as to images, pictures related to child

12   pornography or some specific language like that.  It just

13   stated all computer related technology.

14          And then based on the suppression, the items seized

15   consisted not only of computer devices but cameras.  You also

16   have adult magazines.  And, again, I'm not sure if those were

17   specifically mentioned.  We allege that those weren't

18   specifically mentioned in the affidavit.

19          And so we challenge the warrant based on the

20   particularity requirement, and we would say that on its face it

21   is deficient and objectively -- using an objective standard, we

22   say that the good-faith exception does not apply to counter the

23   State's [sic] point in their motion.

24          The Courts have stated that if an affidavit is so

25   facially deficient that an objectively reasonable officer would

1  know that it is illegal -- that the execution of it is

2  unconstitutional, we believe, again, based on the overbreadth

3  of this affidavit that the officers should have realized that

4  it was unconstitutional and should be modified to include more

5  specific provisions as to the evidence that they were seeking

6  from the residence.

7         Thank you.

8         THE COURT:  Ms. Fleck.

9         MS. FLECK:  Your Honor, first with regards to the

10  good-faith exception, I think the case law is clear that Your

11  Honor should look at the search warrant in this type of motion

12  to suppress and follow a two-part test, the first part being

13  whether or not the good-faith exception applies.  And if Your

14  Honor finds that does apply, we need not even look at whether

15  or not the search warrant had -- or the magistrate had a

16  substantial basis for finding probable cause on the search

17  warrant.

18         There is no evidence presented by the defense, which

19  is their burden here today, to show that any of these agents

20  lied or misled Judge Counts in any way or that Magistrate Judge

21  Counts wholly abandoned his judicial role.  Therefore, they

22  cannot show that the agents did not act in good faith.  Quite

23  to the contrary, Agent Santana's testimony here today shows

24  these agents did everything that they were supposed to do.

25         They did act in good faith.  They acted immediately.

1    They did as much as they could and as fast as they could to

2    save that child.  But in the end it did take four days, because

3    that's how long it took to play by the rules and to get the

4    search warrant approved appropriately rather than go

5    immediately to the house and try to rescue that child.

6          They had a lengthy affidavit prepared.  It was

7    reviewed by the supervisor of the U.S. Attorney's Office and

8    approved by him.  It was then taken by the magistrate.  He read

9    it.  He reviewed it.  Agent Santana testified that several

10   changes or clarifications were made before he signed off on it.

11   They then attached -- they also had a lengthy affidavit and

12   attachments to that affidavit, all correctly incorporated into

13   the search warrant itself.  The search warrant was executed,

14   and all of that was done in good faith.

15         Therefore, I would argue that because the agents

16   acted in good faith, Your Honor doesn't have to go any further

17   into the inquiry.  However, for purposes of this motion, I

18   would also point out that there was sufficient probable cause

19   in that Judge Counts did have a substantial basis for finding

20   probable cause in this affidavit.

21         If you look at the affidavit itself, it goes through

22   what law enforcement in Canada learned from Alan Clarke.  And

23   no, they didn't know this person.  He wasn't a law enforcement

24   officer or someone known to law enforcement, but they were able

25   to corroborate what he was saying.  They had a still photograph

1    of the suspect.  They had a still photograph of the victim.

2    They had copies of the chat logs, which were sexual in nature,

3    talking about oral sex with a three-year-old, which was

4    corroborated by the photographs that they were seeing.

5           They went and corroborated the Howells.  They talked

6    to the Howells.  They looked at the photograph.  They saw that

7    it wasn't Jeffrey Howell.  They asked Mr. and Mrs. Howell who

8    the person was in the photograph.  The Howells told them, "Oh,

9    that's our friend, John Brunson."  They gave them an address

10   and directions to this address.  And all of this is set forth

11   in the affidavit.

12          If you look at paragraph -- the top of page 5 of the

13   affidavit, Agent Santana explains that Agents Rodriguez and

14   Pena went directly to the location of the residence based upon

15   the Howells' directions and confirmed their description of the

16   residence as being the location.  It even describes the

17   discrepancy with the addresses, and that was clarified several

18   times throughout the affidavit.

19          They corroborate the two vehicles that should be at

20   the residence.  They also set up surveillance, as Agent Santana

21   told you here today, and were able to corroborate that the

22   Defendant was the person matching the photograph who was

23   leaving the residence, getting into one of the vehicles.

24          They talked to the Howells and found out -- and,

25   again, this is explained in the first full paragraph on page

1   5 -- that the Brunsons' in-laws, the Johnsons, actually own the

2   property.  All of that is described in the affidavit.

3          And they didn't just take the Howells' word for it.

4   They did property checks.  They found out that that wasn't --

5   the property was owned by the Johnsons.  But that's irrelevant,

6   because the person they knew to be the suspect was the person

7   in that photograph, and that's the same person that the Howells

8   identified and that the agents themselves saw coming out of

9   that residence.

10          Looking at the four corners of the search warrant and

11  affidavit in support of the search warrant, Your Honor, I think

12  it's clear that there was sufficient probable cause and that

13  Judge Counts was not unreasonable in signing the search

14  warrant.  And before you even get to that, again, I would urge

15  that these agents acted in good faith.

16          Thank you.

17          THE COURT:  Mr. Castillo, anything in rebuttal?

18          MR. CASTILLO:  No, Your Honor.

19          THE COURT:  The Court finds that the agents did

20  execute the warrant in good faith.

21          The Court further finds that the warrant contained

22  more than bare bones allegations and, in fact, was supported by

23  probable cause.

24          The Court further finds the warrant was sufficiently

25  particular in its description of the items to be seized.

1          And the Court finds that the cases cited by the

2     Defendant from the Tenth Circuit are in point -- or can be

3     distinguished on the facts, particularly when you look at the

4     case of -- the Riccardi case, R-I-C-C-A-R-D-I.

5          In that case, the warrant authorized the search and

6     seizure of the Defendant's entire computer without reference

7     to, quote, any particular federal crime.  Because the warrant

8     in this case cites child pornography statutes, Riccardi does

9     not apply.  Furthermore, even if Riccardi did apply, it would

10    not mandate suppression, because, as already explained, the

11    warrant in Riccardi was upheld under the good-faith exception.

12         Further, in U.S. -- excuse me.  Otero was another

13    case cited by the Defendant.  Again, while -- in that case the

14    Court found that the respective warrants were insufficiently

15    particular, they both -- the Court went on to uphold the

16    warrant under the good-faith exception.

17         And in Leary, another case cited by the Defendant

18    from the Tenth Circuit, Leary was not a case involving child

19    pornography.  And in that case, Leary was referencing federal

20    statutes that encompass a wide range of criminal conduct.  For

21    instance, conspiracy prohibiting illegal export of materials

22    abroad.  The Defendant has ignored the fact that Leary also

23    noted that, quote, some federal statutes may be narrow enough

24    to meet the Fourth Amendment particularity requirement.

25         In this case, the Court finds that the laws

1   prohibiting the trade of child pornography are such statutes

2   because there is only one type of evidence that can be subject

3   to seizure in relation to a child pornography warrant, and that

4   deals with images and how they are stored or made of children

5   engaging in sexually explicit conduct.

6           For these reasons, the Court respectfully overrules

7   the Defendant's motion to suppress.  The Court will provide a

8   written memorandum opinion and order in this matter.

9           All right.  I note, Mr. Castillo, that the Defendant

10  is set to plea on the 22nd.  Is that a conditional plea?  Is

11  that my understanding?

12          MR. CASTILLO:  For right now, yes, Your Honor.

13          THE COURT:  Okay.  I didn't know if you and

14  Ms. Fleck -- I just noticed on the docket call, when there was

15  a docket call, that there was going to be a plea.  And I

16  assumed that it would be a conditional --

17          MS. FLECK:  I believe he set a date, but it hasn't

18  been firmed up between him and the client if that's, in fact,

19  how he wanted to proceed.

20          THE COURT:  Because we had the plea deadline time

21  coming up, I think the 22nd may be the plea deadline time.

22  So --

23          MR. CASTILLO:  It's actually the 21st, but Judge

24  Counts was in a civil trial, and so we were moving it to the

25  22nd.  But it is my understanding that has been pled out or

1  settled, and so we're going to move it back to the 21st.

2  THE COURT:  Okay.  Well, I would just say if not, we

3  need to get you a date in February so we can try the case.

4  I'm sure you explained to Mr. Brunson about what a

5  conditional plea is and that you reserve the right to appeal my

6  decision on the search and seizure issue, waive other rights of

7  the appeal with the exception of constitutional ineffective

8  assistance of counsel and prosecutorial misconduct, which is

9  the normal sort of plea agreement from the Government.

10  All right.  With that, if you will just keep Judge

11  Counts and me informed about what's going on.

12  And Mr. Brunson is remanded back to the custody of

13  the United States Marshals.

14  (Hearing adjourned)

15

16

17

18

19

20

21

22

23

24

25

1    I, TODD ANDERSON, United States Court Reporter for the

2    United States District Court in and for the Western District of

3    Texas, Midland/Odessa Division, hereby certify that the above

4    and foregoing contains a true and correct transcription of the

5    proceedings in the above entitled and numbered cause.

6    WITNESS MY HAND on this 28th day of June, 2010.

7

8

9

/s/Todd Anderson
10                                   TODD ANDERSON, RMR, CRR
United States Court Reporter
11                                   200 E. Wall, Rm. 116
Midland, Texas  79701
12                                   (432) 686-0605

13

14

15

16

17

18

19

20

21

22

23

24

25