IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

MIDLAND/ODESSA DIVISION


THE UNITED STATES OF AMERICA, * Case No. MO-09-M-239
                               *
    Plaintiff,                 *
                               *
       v.               *
                               *
JOHN CHRISTOPHER BRUNSON,   *
                               *
    Defendant.            *
* * * * * * * * * * * * * * * September 16, 2009

---------------------------------------------------

PRELIMINARY AND DETENTION HEARING

BEFORE THE HONORABLE DAVID COUNTS

UNITED STATES MAGISTRATE JUDGE

---------------------------------------------------

APPEARANCES:

For the Plaintiff:  UNITED STATES ATTORNEY'S OFFICE
                  By:  Ms. Kerry Fleck
                  400 West Illinois, Suite 1200
                  Midland, Texas  79701


For the Defendant:  LAW OFFICES OF ROY SCOTT
                  By:  Mr. Damian Castillo
                  407 N. Big Spring, Suite 200
                  Midland, Texas  79701



Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

INDEX

| WITNESSES FOR THE PLAINTIFF | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Agent Santana | 3 | 12 | 19 | |

WITNESSES FOR
THE DEFENDANT

| Proffer of Testimony | 25 |
|---|---|

| EXHIBITS: | Offered | Received |
|---|---|---|
| (None offered) | | |

| ARGUMENT: | |
|---|---|
| By Ms. Fleck | 27 |

| RESPONSE: | |
|---|---|
| By Mr. Castillo | 30 |

| RULING OF THE COURT: | 36 |
|---|---|

* * * * * * * * * * * *

1    THE COURT:  The Court will call U.S. versus

2  John Christopher Brunson, MO-09-M-239.

3    Announcement for the Government?

4    MS. FLECK:  Kerry Fleck on behalf of the

5  Government.

6    THE COURT:  Thank you, Ms. Fleck.

7    MR. CASTILLO:  Damian Castillo on behalf of

8  Mr. Brunson, your Honor.  We're present and ready.

9    THE COURT:  Thank you, Mr. Castillo.

10    Ms. Fleck, please call your first witness.

11    MS. FLECK:  The Government calls Agent

12  Santana.

13    THE COURT:  Agent Santana, if you'll

14  approach, please.

15    (Witness sworn by the Courtroom Deputy.)

16    COURTROOM DEPUTY:  State and spell your name

17  for the record.

18    THE WITNESS:  Juanita Santana, S-A-N-T-A-N-A.

19    DIRECT EXAMINATION

20  BY MS. FLECK:

21  Q.    And how are you employed?

22  A.    I'm a criminal investigator, senior special

23  agent, with Immigration and Customs Enforcement.

24  Q.    How long have you been a law enforcement officer?

25  A.    Over 20 years.

1  Q.   And it's my understanding that you were involved

2  in the investigation that led to the arrest of John

3  Christopher Brunson; is that correct?

4  A.   Yes, ma'am.

5  Q.   And Mr. Brunson was arrested by you and your

6  fellow agents on September 11th of this year?

7  A.   That's correct.

8  Q.   Can you tell this Court how you first became

9  aware of some illegal activities on the part of

10 Mr. Brunson?

11 A.   On August 31st, approximately 5:30 in the

12 afternoon, I received a lead from Jesse Miller; he's a

13 special agent with ICE in Vancouver, British Columbia;

14 he's assigned to the Office of International Affairs.

15 He contacted me because, in turn, he had received

16 a lead from the Royal Canadian Mounted Police, where

17 they had received a complaint from a subject by the

18 name of Alan Clark.  Mr. Clark had been on a Yahoo

19 chatroom, and contacted Chris Howell.  Chris Howell

20 requested Mr. Clark to go into a private room where

21 the conversation became sexual in nature.

22 Q.   Now, this individual that Mr. Clark identified

23 to the Canadian police as Chris Howell, was that name

24 given in the chatroom either as a user name or a name

25 that was given by this individual?  Is that right?

1   A.   It's the name that reflects in the chat log, yes.

2   Q.   Now, once Mr. Clark began talking to this person

3   who represented themselves as Mr. Howell, what

4   concerned him to the point where he decided to go to

5   law enforcement?

6   A.   Mr. Howell advised Mr. Clark that he was getting

7   ready to engage in sexual acts with his three-year-old

8   daughter, that she was running around in the

9   background.  Mr. Clark could see the child running

10  around in the -- through the webcam image.  And he was

11  very concerned because Mr. Brunson, at the time acting

12  as Mr. Howell, advised him that he was getting ready

13  to get naughty with her, that he was getting ready to

14  initiate oral sex with the child.

15  Q.   Did he describe -- Did this person describe --

16  identifying himself as Mr. Howell, describe to

17  Mr. Clark what type of act he was going to perform

18  with his three-year-old child?

19  A.   Yes.

20  Q.   And what did he say?

21  A.   Mr. Howell, Brunson, told Mr. Clark that he was

22  getting ready to get naughty with her, to engage in

23  sexual acts, that he was going to get her to suck his

24  private parts.

25  Q.   So, he was indicating -- Mr. Howell, we'll call

1  him for now, was indicating that he was going to get

2  the three-year-old child to perform oral sex on him;

3  is that correct?

4  A.    That's correct.

5  Q.    And you mentioned that Mr. Clark told the police

6  that he could actually see a child that appeared to be

7  a three-year-old child running around in the

8  background because they were talking to each other

9  through a webcam; is that right?

10  A.    That's correct.

11  Q.    Okay.  Now, once this information was relayed to

12  the Canadian police and to the ICE agents in Canada,

13  how did it track back to you here in Midland?

14  A.    The Royal Canadian Mounted Police has a unit of

15  intelligence analysts that work these type of cases.

16  And they researched the name "Chris Howell" through

17  different sources, open sources, and they located a

18  Chris Howell with several profiles on social

19  networking sites, Yahoo, Stickem (phonetic), Myspace,

20  Any Webcam (phonetic), and other adult spaces, as

21  well.

22  Q.    And were they able to identify an individual

23  through these sources, named Chris Howell, that lived

24  in the Midland/Odessa area?

25  A.    Yes.  Chris Howell identified himself as a

1   33-year-old male, white male, living in Odessa, Texas.

2   Q.   And you say he identified himself.  Was that

3   through Myspace?

4   A.   Yes, ma'am.

5   Q.   And were law enforcement officers able to track

6   down this individual named Chris Howell in Odessa,

7   Texas?

8   A.   Yes, ma'am.

9   Q.   And once they met with Mr. Howell, did they

10  notice, by looking at any pictures, or how did they

11  figure out that this Mr. Howell was not the person who

12  had been speaking to Mr. Clark?

13  A.   Of the images that we received from Mr. Clark,

14  there were two photographs of Mr. Howell, of Chris

15  Howell.  When we researched the Myspace page for

16  Chris Howell, there's a number of photographs.  There

17  are also logos and photographs of the U.S. Army.  One

18  of the logos pertains to the Permian Basin Air Soft,

19  which is a team of people that go out and play war

20  games in the desert.  When we reached the Permian

21  Basin Air Soft Space page, we found a member by the

22  name of John.  John and Chris Howell are one and the

23  same when we compared the photographs; they even had

24  the same typographical errors in their profiles.  John

25  and Chris Howell were the same.  Chris Howell listed

1    on his "friends" other residents of Odessa, and we

2    visited them that night.  And we provided them with

3    photographs and copies of the web pages for Chris

4    Howell, and established that Chris Howell is John

5    Brunson.

6    Q.    So, Chris Howell, the actual Chris Howell that

7    you visited in Odessa, when looking at the pictures

8    that Mr. Clark had provided from his chat with,

9    supposedly, Mr. Howell, he identified that person

10   as not him, it's John Brunson; --

11   A.    Yes.

12   Q.    -- is that correct?

13   A.    Yes.

14   Q.    Did Mr. Howell indicate how he knew Mr. Brunson?

15   A.    Mr. and Mrs. Howell know each other (sic).  They

16   have known John Christopher Brunson for many years.

17   As a matter of fact, I believe he attended school with

18   Marie Howell, and dated for a while, like in the 9th

19   grade.  So, they have known him for a long, long time.

20   Q.    And did the Howells tell you where you could find

21   Mr. Brunson?

22   A.    Yes.  They gave us instructions on how to get to

23   the residence, gave us a lot of information, what type

24   of vehicle they drove, description of the premises,

25   everything.

1  Q.   And based off of this information, in part, did

2  you apply for a search warrant through Judge Counts,

3  and receive one, and execute it the late part of last

4  week or early part of this week?

5  A.   On September 3rd, we executed the search warrant.

6  Q.   Okay.  And can you tell the Court what you found

7  when you executed -- executed the search warrant?

8  A.   Well, at the residence we found the exact same

9  room that was depicted in the pictures from the

10 Internet, from the webcam.  The same logos, the same

11 patches, the air-conditioner unit in the window, the

12 floor, the desk, the chair, the rolling chair, were

13 all identical.  Also, the child was at the residence,

14 the three-year-old child was at the residence.  And

15 we recovered several computers, a webcam, digital

16 cameras, other storage media from the house.

17 Q.   And just to be clear, can you tell us where --

18 where this house was located?

19 A.   The residence is located in northwest Odessa,

20 very remote, in the county.

21 Q.   Now, was Agent Heath Hardwick with you and your

22 other fellow agents when you executed the search

23 warrant?

24 A.   Yes, ma'am.

25 Q.   And is he trained to forensically examine

1  computers and other hardware?

2  A.    That's correct.

3  Q.    And did he do a preview, what we call a preview,

4  to get sort of a quick glimpse at what is contained on

5  the computers at the residence?

6  A.    Once we transported all the items back to the

7  RAC office in Midland, he did the preview, yes.

8  Q.    Okay.  So, the preview is done at you all's

9  office?

10 A.    Yes, ma'am.

11 Q.    And what did Agent Hardwick discover when he did

12 this preview?

13 A.    He discovered in the laptop, under the file

14 called "John," he discovered three images of the

15 three-year-old child, basically what we consider child

16 pornography.

17 Q.    And I know this is uncomfortable, but could you

18 describe what those images depicted?

19 A.    The first image, the child is wearing a pink top

20 with white trim on the sleeves and a cartoon character

21 up front; she's not wearing a diaper, she's not

22 wearing any other clothing, and her genital area is

23 exposed.  The picture is from the neck down.

24       On the second picture, the image depicts the

25 child laying down flat on the ground, same pink top,

1  no underwear, no PJs, no bottoms, and exposing

2  herself, as well.

3       The image that is very disturbing is when the

4  child is exposing her genitalia to the camera with her

5  hands.

6  Q.   And when you say "with her hands," are her legs

7  actually spread and she's using her hands to -- to

8  reveal her genitalia to the camera?

9  A.   On that one she's standing up, yes.  But she is

10  exposing her genitalia, yes.

11  Q.   Okay.  Now, these three images were found during

12  the preview, but Agent Hardwick is still in the

13  process of fully examining the computer and other

14  media that was used; is that right?

15  A.   That's correct.

16  Q.   Through his initial examination, beyond the

17  preview, has he found further photographs that seem

18  to be of this same series that you just described?

19  A.   Yes, ma'am.

20  Q.   In one of the photographs that he has found

21  within this series, does there depict a male hand,

22  an adult -- what appears to be an adult male hand,

23  assisting the child in spreading her legs and exposing

24  her genitalia to the camera?

25  A.   That's correct.

1    Q.    Okay.  The cameras that were seized from

2    Mr. Brunson's house, were any of those, through your

3    investigation, manufactured in the State of Texas?

4    A.    No, ma'am.

5    Q.    And the child, the three-year-old child that was

6    depicted in the photographs and at the residence, did

7    CPS remove that child from the home?

8    A.    Yes, ma'am.

9            MS. FLECK:  I have no further questions at

10   this time, your Honor.

11           THE COURT:  Mr. Castillo?

12           MR. CASTILLO:  Thank you, your Honor.

13                   CROSS-EXAMINATION

14   BY MR. CASTILLO:

15   Q.    Ms. Santana, you -- you obtained a subpoena from

16   Yahoo; is that correct?

17   A.    Agent Jesse Miller did.

18   Q.    You served a subpoena on Yahoo?

19        Okay.  What information did you obtain from

20   that?

21   A.    I received a copy of it from Jesse Miller in

22   Canada.  And the subpoena indicates that the user ID

23   is "westexdad," which is John or Chris -- Chris

24   Howell, John, also known as John Brunson, uses

25   "westexdad," 33 years old, out of Odessa.

1   Q.   What name came back as registered to that Yahoo
2   account?
3   A.   Chris Howell.
4   Q.   And did they give you an IP address?
5   A.   Yes, they sure did.
6   Q.   Do you know if it was a static or dynamic IP
7   address?
8   A.   I do not know.
9   Q.   It just says it was registered to a Chris
10  Howell?
11  A.   Yes, sir.
12  Q.   Okay.  When you started investigating and --
13  You said that someone spoke to a "Clark"; is that
14  correct?
15  A.   Yes.
16  Q.   Okay.  And this Clark was texting or chatting
17  back and forth --
18  A.   He was chatting back and forth.
19  Q.   -- with Chris Clark (sic)?
20  A.   Yes.
21  Q.   Okay.  The images that he was seeing, were those
22  live images?
23  A.   Yes.
24  Q.   Okay.  There was no sexual acts being portrayed,
25  was there?

1    A.    No, sir.

2    Q.    Did he see the face of the person he was chatting

3    with?

4    A.    Yes.

5    Q.    How did he obtain a picture of that face?

6    A.    He explained it to the constables; we have a copy

7    of the interview.  It appears that Mr. Clark is pretty

8    savvy with computers.  And he was able to obtain

9    digital photos of the video that was being streamlined

10   by Mr. Brunson to him, and it's the picture of

11   Mr. Brunson in his computer room.

12   Q.    When -- When you went to visit the Howells'

13   residence, how many people lived there?

14   A.    At the Howell residence?

15   Q.    Yes.

16   A.    We met Mr. and Mrs. Howell and their twins.

17   Q.    And how old were the twins?

18   A.    Three years old.

19   Q.    Did the agents obtain a search warrant for that

20   home, since the name matched with the name on the

21   Yahoo chat?

22   A.    No, we did not.

23   Q.    Is there a reason for not searching the Howells'

24   residence or -- or considering --

25   A.    That was very early.  It was in the early stages

1    of the investigation, and we decided to conduct a

2    knock and talk.  A decision was made to approach the

3    residence and conduct a knock and talk.  It was a low,

4    easy, gentle approach; we knew there were twins,

5    three-year-old twins at the residence.  And we just

6    wanted to see who is this person, to see if Jeffrey

7    Mark Howell is Chris Howell or is John Brunson, who

8    this person was.

9    Q.    Okay.  So, when you saw there was three-year-old

10   children living there, and you saw the Howells, you

11   didn't think it was a good idea, perhaps, to search

12   that home for computers, laptops, pictures?

13   A.    We had no reason to search the home for

14   computers.

15   Q.    You said that the Howells directed you to

16   Mr. Brunson's residence?

17   A.    Yes.

18   Q.    So, they obviously knew where he lived?

19   A.    Yes.

20   Q.    Did the agents ask Mr. Howell whether he'd been

21   over to the Brunsons' residence?

22   A.    They told us that he had been there as recent as

23   about a month ago, when he was sick and they went and

24   took him to the doctor.

25   Q.    When they arrived at the Brunsons' house, do you

1  know if they asked Mr. Brunson or Mrs. Brunson whether

2  Mr. Howell would regularly come to their house or

3  not?

4  A.   You mean during the search warrant?

5  Q.   When they arrived at the Brunsons' house, was

6  there any questions asked as to whether the Howells

7  would come over to their home?

8  A.   The Howells to the Brunsons?

9  Q.   Yes.

10  A.   Yes.  And they said they visited at least once

11  a month.

12  Q.   So, they had somewhat of a relationship with

13  them, enough to --

14  A.   Yes, they sure did.  Yes.

15  Q.   Enough to make visits to their home?

16  A.   Yes.

17  Q.   You said these three images were obtained from

18  a laptop?

19  A.   That's correct.

20  Q.   Okay.  Would you -- Were the agents able to tell

21  if any of those images had been sent from that laptop

22  across the computer -- across the Internet?

23  A.   I do not know at this time, and the -- the

24  examination is still underway.

25  Q.   You understand part of this charge is that the

1 **pictures may move across interstate commerce or**

2 **foreign commerce.  Do you know if -- if there was any**

3 **sign of anything being passed on?**

4             MS. FLECK:  Your Honor, that's actually a

5 misstatement of the law.  He hasn't been charged with

6 sending any pictures across state lines.

7             MR. CASTILLO:  Well, I believe it's, he

8 knows or has reason to know, under the statute, your

9 Honor.

10             MS. FLECK:  We have charged him with using

11 materials that had been manufactured outside of the

12 State of Texas to produce child pornography.

13             THE COURT:  Under 2251(b); correct?

14             MS. FLECK:  Yes, sir.

15             THE COURT:  All right.  I'll -- I understand

16 the law.  Go ahead.

17             MR. CASTILLO:  Okay.

18 **Q.   (By Mr. Castillo)  You said there was other**

19 **photos obtained from the laptop.  Do you know how many**

20 **other photos there were?**

21 **A.   Dozens and dozens.**

22 **Q.   How many?**

23 **A.   There are several dozen photos, yes.**

24 **Q.   Dozen?**

25 **A.   Yes.  There's eight total images reflecting the**

1    child, depicting the child, eight total.  And there

2    are other images, --

3    Q.    All right.

4    A.    -- as well.

5    Q.    Real quick, back to the -- the information

6    obtained from Yahoo.

7    A.    Uh-huh.

8    Q.    There was an IP address obtained?

9    A.    Yes.

10   Q.    Okay.  The IP goes to a particular house.  Do you

11   know what house it went to?

12   A.    That information was not on the subpoena.  That

13   information was not available.

14   Q.    It wasn't requested, or it wasn't available?

15   A.    In the results, in the subscriber information, it

16   indicates Chris Howell, Odessa, Texas, and his

17   "westexdad" handle.

18   Q.    And just so that we understand, both Chris Howell

19   and Mr. Brunson live in Odessa, Texas; is that

20   correct?

21   A.    Chris is Mr. Brunson's middle name; his name is

22   John Christopher Brunson.  And Howell is his best

23   friend's last name.

24   Q.    They both live in Odessa?

25   A.    Well, I don't know if there's a Chris Howell that

1    lives in Odessa.

2    Q.    The Howells live in Odessa?

3    A.    Yes, they do.

4            MR. CASTILLO:  Pass the Witness.

5            THE COURT:  Ms. Fleck?

6                REDIRECT EXAMINATION

7    BY MS. FLECK:

8    Q.    And just sort of to clarify that.  Mr. Howell,

9    who's Mr. Brunson's best friend, his first name is

10   not Chris; right?

11   A.    Absolutely.

12   Q.    It's Jeffrey?

13   A.    Jeffrey Mark.

14   Q.    Okay.  When you went to the Howells' residence,

15   you had already observed the pictures that were taken

16   as stills from the video or web chat with Mr. Clark, I

17   believe it is, up in Canada?

18   A.    Yes, ma'am.

19   Q.    So, when you met Mr. Howell, you could see that

20   he was not the person in the chat?

21   A.    Actually, before we went to the house we knew he

22   wasn't the person because we researched him and

23   conducted a lot of searches, and one of them was his

24   driver's license photo.  We knew that Mr. Howell was

25   not Chris Howell.

1  Q.   And the evidence that you were able to review

2  from the Canadian authorities, did some of those

3  pictures depict the three-year-old child that was sort

4  of running around in the background while this chat

5  was going on?

6  A.   Yes, ma'am.

7  Q.   And when you saw the -- the Howells' twins, were

8  you able to identify that those were not -- either of

9  those twins were not the three-year-old in the video?

10  A.   Yes, ma'am.

11  Q.   After the child was removed by CPS from the

12  Brunson home, was she taken to Harmony Homes to be

13  interviewed by a forensic interviewer?

14  A.   Yes, ma'am.

15  Q.   And can you tell the Court about what happened

16  during that interview?

17  A.   During that interview, the child was very uneasy

18  every time the interviewer tried closing the door.

19  She would not remain in the room, in the interview

20  room, while the door was closed.  She kept on walking

21  back.  And that door, you could tell, the handle was

22  pretty strong, and she would bend her little arm and

23  open the door.  The interview was conducted, against

24  their policy, with the door open because the child

25  would not remain in the room.

1    She eventually makes it to a drawing table, and
2  is engaged by the interviewer (inaudible).  They start
3  coloring, and talking about fish.  And her language is
4  very delayed; her language, her -- her skills, her
5  vocabulary is delayed.  And she was not interacting
6  well with the interviewer, because she regressed
7  behaviorally and her language skills are not there.
8  Q.   And was -- was -- Isn't it true that she was
9  wearing a diaper the entire time from when you saw her
10  during the search warrant through the time she was at
11  Harmony Homes, and even in some of the photographs
12  that were seen on the computers?
13  A.   Yes, she wears diapers.
14  Q.   And she's three years old; correct?
15  A.   Yes, ma'am.
16  Q.   Was there a point in time when the forensic
17  interviewer gave her a drawing of sort of an
18  anatomically correct male body, --
19  A.   Yes, ma'am.
20  Q.   -- and asked -- just sort of presented it to her
21  to see how she would react; is that right?
22  A.   Yes.
23  Q.   How did the girl react?
24  A.   Well, she was coloring with a blue pen, I
25  believe.  And she immediately went towards the genital

1    part and scratched it off, really quickly, really

2    quickly scratched it off.  She then got another piece

3    of paper and covered that part with another piece of

4    paper.  She didn't want anything to do with it.  She

5    eventually pushed it off the table behind her.  She

6    didn't want to look at it anymore.

7    Q.    Now, through your investigation, you were able

8    to discover that Mr. Brunson also has two other

9    daughters, including a 14-year-old daughter who now

10   lives out of state; is that right?

11   A.    That's correct.

12   Q.    And there was an arrest in the early '90s, I

13   believe it was 1993, where this daughter had alleged

14   some sort of physical or sexual abuse by the hand --

15   at the hand of Mr. Brunson; is that right?

16   A.    That's correct.

17   Q.    And those were charges that were eventually

18   dropped, as far as you know at this point in time?

19   A.    Yes, ma'am.

20   Q.    After that allegation, that mother actually won

21   custody of the daughter and moved her out of state; is

22   that right?

23   A.    I believe the mother doesn't have custody of

24   the child.  The child is of the care, I believe, of

25   a grandmother or a family friend.

1    Q.    Okay.

2    A.    But she's no longer in the state.

3    Q.    Did you receive information -- I know you did

4    some investigation into Mr. Brunson before you

5    executed the search warrant.  But did you receive

6    any information, either prior to the execution of the

7    search warrant or during the execution of the search

8    warrant, that led you and your fellow officers to have

9    some concern for your safety?

10   A.    Yes.

11   Q.    Can you tell the Court about that?

12   A.    In our conversations with the Howells, we were

13   warned that Mr. Brunson has an anti-government

14   attitude, an anti-agent attitude, especially against

15   Hispanics or Arabs, and that we wouldn't be welcomed

16   at his residence, basically.  And the night that we

17   were intending to serve the search warrant, we were

18   all Hispanic agents.  We were a little bit concerned

19   because they told us he has a collection of knives

20   and weapons, and he does have a history for weapons

21   violations in Illinois.  So, we were concerned for

22   our safety, and for the safety of his wife and of the

23   child, as well.

24   Q.    And once you were in the home, did you see any

25   evidence of this sort of gun collection and

1   **anti-Hispanic, racist actions, at all?**

2   **A.   As a matter of fact, in the webcam photo of the**

3   **child in the background, there's a big black case for,**

4   **like, a weapon.  The computer room was littered with**

5   **weapons.  And, as it turned out to be, they were all**

6   **weapons used to play simulations and to use for the**

7   **war games, but they do look real.  We also found a set**

8   **of credentials for a criminal investigator with the**

9   **CID, with the U.S. Army.  It appears as if it's a**

10   **replica, but it's placed in a badge, in a holder, just**

11   **like a regular agent credentials would look like.**

12   **Q.   Okay.**

13        MS. FLECK:  I have no further questions,

14   your Honor.

15        THE COURT:  Mr. Castillo?

16        MR. CASTILLO:  No more questions, your

17   Honor.

18        THE COURT:  Okay.  Agent Santana, you may

19   step down.  Thank you.

20        THE WITNESS:  Thank you, sir.

21        THE COURT:  Ms. Fleck?

22        MS. FLECK:  No other witnesses, your Honor.

23   The Government rests.

24        THE COURT:  All right.  Mr. Castillo,

25   anything from the Defendant?

1    MR. CASTILLO:  If I could just make a

2  proffer on behalf of my client, your Honor.

3    THE COURT:  Okay.

4    MR. CASTILLO:  I would just proffer, your

5  Honor, that Mr. Brunson has been notified by his wife

6  that she is a -- she's still in their home, and that

7  she would be willing to be a designated individual to

8  watch over him.  The child has been placed elsewhere

9  at this time.  And I know that may be a concern of the

10  Court.

11    THE COURT:  What's her name?  Mrs. Brunson,

12  what's her name?

13    MR. CASTILLO:  Ariel (phonetic) Brunson.

14    THE COURT:  Ariel (phonetic) Brunson?

15    MR. CASTILLO:  Yes, your Honor.

16    THE COURT:  Okay.  Go ahead.

17    MR. CASTILLO:  And she has made it known to

18  us that she would be willing to -- to watch over him

19  in their residence, considering they've been residents

20  of Ector County for 30-plus years, I believe, or

21  pretty much their whole life, about 30 years.

22    THE COURT:  Very good.  Thank you,

23  Mr. Castillo.

24    Mr. Castillo, I was just going to tell you,

25  (inaudible; microphone) dismissing you on the -- on

1  the statute, I just -- I understood your question; I

2  guess I was actually dismissing the Government.  But I

3  understood your question, and I -- I just wanted to

4  move on because I think -- I don't think it mattered

5  to the charge.  So, I just...

6       MR. CASTILLO:  And just -- It's just a

7  question, I guess, of interpretation of the statute,

8  your Honor.

9       THE COURT:  I think so, too.  I think so,

10  too, because the statute does allow -- does talk about

11  it.  But I think the Government was right.  And I

12  understood what you were asking.  And I didn't think

13  it was going to matter, because Agent Santana didn't

14  have any evidence as to interstate or foreign

15  commerce.  Correct?

16       (No audible response.)

17       THE COURT:  All right.

18       MR. CASTILLO:  Your Honor, again, I

19  apologize --

20       THE COURT:  No.

21       MR. CASTILLO:  -- for wasting the Court's

22  time with that.

23       THE COURT:  No, no.

24       MR. CASTILLO:  That's probably an issue

25  we'll bring up at a later time.

1          THE COURT:  I would have asked the same

2     question, I think, if I were you.  But I -- But I

3     don't think it -- At this point, I don't think it

4     matters.  It may matter at some point.

5          MR. CASTILLO:  I guess I'm -- Maybe I'm just

6     ruling that section out.

7          THE COURT:  Okay.  Yeah.  Right.  I see

8     what you're trying to do.  Well, but things can

9     change, Mr. Castillo.

10          MR. CASTILLO:  Thank you, your Honor.

11          THE COURT:  Yes, sir.  Thank you.

12     Ms. Fleck, any argument?

13          MS. FLECK:  Yes, your Honor.  I guess

14     we're -- we're here for a preliminary exam, as well as

15     a detention hearing.  I'll just argue both at the same

16     time, if that's all right with your Honor.

17          I think there's clearly probable cause in this

18     case.  Your Honor did point out, and Mr. Castillo

19     pointed out, the distinction in 2251 versus 2252

20     violations, and that.  At this time, the computers are

21     still being forensically examined, and we don't know

22     whether or not we will find images having been

23     distributed via the Internet.  However, under 2251,

24     production of child pornography, there is a -- sort

25     of a series of ways that we can use that interstate

1 commerce element. And I believe they are listed with

2 "or," as the conjunction. And one of those ways is

3 using materials that have been made and -- and shipped

4 in interstate commerce. And Agent Santana did testify

5 that all of the cameras and webcam that were seized

6 from Mr. Brunson's residence were not manufactured

7 within the State of Texas.

8 I think it's clear from her testimony that there

9 was production of child pornography made at that home

10 with that three-year-old child. Specifically, she

11 testified to one particular image in which there is

12 a male hand in the photograph being used to spread the

13 child's legs and show the genitalia to the camera.

14 If you look at Mr. Brunson's Pretrial Services

15 report, he admits that he lives there with his wife

16 and daughter, and no other individuals are listed.

17 Clearly, the hand in the photograph was described as a

18 male hand; thereby, through process of elimination,

19 making that Mr. Brunson's hand.

20 And considering that, in conjunction with the

21 evidence that was obtained from Canada, I don't think

22 that probable cause is an issue. And Judge Junell has

23 signed the complaint in this case, obviously

24 indicating that he believed there was probable cause,

25 as well.

1   With regards to detention, I would most

2   importantly argue that this is a case where there is

3   a presumption that he is a danger to the community,

4   and especially to children.  I would argue that he be

5   detained for that reason.

6   I do think that there's a possibility that he's

7   a flight risk, given the fact that he'd be facing a

8   15-year minimum mandatory prison sentence.  He has

9   some ties to Tennessee and Illinois, doesn't appear

10  that he has any ties out of state -- outside of the

11  country.  But there's certainly a slight fear that

12  he would be a flight risk, given the severe prison

13  sentence that he is facing.

14  I think the more important concern is that he's

15  a danger to the community.  Agent Santana testified

16  that there were some allegations in the early '90s

17  with another daughter of his.  Those were dismissed,

18  and I can't tell the Court or Mr. Castillo at this

19  time any more information about that.  I will look

20  into it, and I don't know if I'll be able to find out

21  any more about it.

22  But that does raise some concerns when he was

23  here with another daughter, this time a three-year-old

24  daughter, who's severely -- seems to be severely

25  under-cared for.  She's running around at three years

1  old in a diaper, apparently full-time.  She doesn't

2  have the proper language skills.  When she's

3  interviewed by Harmony Home -- And I will proffer

4  to the Court and to Mr. Castillo that there was no

5  physical injury found on the child.  However, the

6  conversation that was taking place with the man in

7  Canada is talking about getting this three-year-old

8  child to perform oral sex on him.  Which, if that was

9  the case, if that had been going on, or was going to

10  go on, would not necessarily leave any physical damage

11  to the child.  It would reinforce what happened when

12  she was interviewed by the interviewer at Harmony

13  Home, when she's presented with a picture, a drawing

14  of a man, and she immediately scratches out the crotch

15  area of the drawing, covers it up, and throws it

16  behind her.  It's extremely disturbing.

17      I guess I would just rest on the fact that

18  this is a presumption, and there's been no evidence

19  submitted by the Defense to overcome that

20  presumption.  And we'd ask that he be detained,

21  your Honor.

22          THE COURT:  Mr. Castillo?

23          MR. CASTILLO:  Thank you, your Honor.

24      As to the probable cause determination, your

25  Honor, I guess I'd just, one more time, ask the Court

1  to refer to the statute, which I am looking at,

2  2251(b), and understand there's several ways of

3  meeting that statute.  I think they're separated by

4  "ifs," one of which, if that visual depiction was

5  produced using material that had been mailed, shipped

6  or transported in interstate or foreign commerce.  And

7  I believe that's what Ms. Fleck said they were trying

8  to make the case on.

9       The images were found, okay, so you may say

10 there's probable cause to determine he's in possession

11 of the material.  As to how they were produced,

12 whether there was a camera found there, I'm not sure

13 if they presented much evidence on whether it was

14 taken with that camera.  I know there's some testimony

15 as to where the camera was obtained from.  But there's

16 not that strong of a link.  It seems like a tenuous

17 link, your Honor.  Again, there may be probable cause

18 to determine possession here.  But I believe the key

19 in most of these selections under the statute is

20 interstate commerce, which is what gives the statute

21 its power here.

22       THE COURT:  So, you're saying, Mr. Castillo,

23 that it would have had to already have been

24 transported, transmitted in interstate or foreign

25 commerce, for it to be -- for a production?

1          MR. CASTILLO:  No, your Honor.

2          THE COURT:  Okay.  Tell me.

3          MR. CASTILLO:  I apologize if I got the --

4          THE COURT:  No, no, no.  I'm just asking.

5          MR. CASTILLO:  Okay.  The first clause where

6    it says, if such parent, legal guardian or person

7    knows or has reason to know that such visual depiction

8    will be transported, that's -- that's, I guess, the

9    first element that you could bring this under.

10         Ms. Fleck seemed to make it known to us and the

11   Court that that's not what they were trying to bring

12   this case under.  It seemed to me that they were

13   trying to bring it under the second provision, which

14   is if that visual depiction was produced using

15   materials that have come from interstate commerce,

16   which I -- I think that's the second.

17         And, excuse me, it seemed like most of the

18   evidence was being focused on this chatroom, on, you

19   know, what has happened in the past in this

20   Defendant's life, the interview with the child.  I

21   didn't hear much testimony of how these pictures were

22   created.  There's talk about a camera that was found.

23   Again, it just seems like a tenuous link, your Honor,

24   if you're talking about a probable cause determination

25   here.

1    THE COURT:  Just -- Just so you -- I just
2  want to make clear, just so you're not saying it has
3  to have already been transmitted --
4    MR. CASTILLO:  No, your Honor, I'm not
5  saying that.
6    THE COURT:  If it -- If there's -- If it
7  will be transmitted, or if there is an idea that there
8  would be transmission, then -- then that's really what
9  we're looking at; correct?
10    MR. CASTILLO:  Correct.
11    THE COURT:  Okay.  All right.
12    MR. CASTILLO:  I just wanted to make that
13  argument to the Court.
14    THE COURT:  I understand your argument.  And
15  I do -- I think you -- you make a good argument.  I
16  just think that the statute -- I think the way the
17  Government is arguing the statute at this point -- And
18  I know all things probably will change after Grand
19  Jury.  But, obviously, this is not to convict Mr. --
20    MR. CASTILLO:  Sure.
21    THE COURT:  -- Mr. Brunson, but to -- to
22  find that there is probable cause or not.
23    Go ahead.  I'm sorry.  I didn't mean to interrupt
24  you.
25    MR. CASTILLO:  Okay.  As to detention, your

1  Honor, we would submit to the Court, we understand the
2  gravity of this crime.  We understand the possible
3  penalty here.  But Section 3142 does state that if you
4  can find a condition or a combination of conditions
5  that would secure the Defendant's appearance in
6  court.  We believe that there are certain conditions.

7      First of all, the Defendant, as stated in the
8  pretrial report, does have strong ties to this
9  community.  He shows here he's been 25 years total in
10  the community.  That's where his wife is.  That's
11  where his family is.  That's where his home is.  As I
12  proffered to the Court, his wife was willing to be a
13  person who can -- a designated person which he can
14  remain in her custody during these proceedings, and
15  assure that he comes to court when he needs to, your
16  Honor.

17      If you -- I understand he does have a little
18  criminal history here on this pretrial report; nothing
19  really as to failing to appear in court, or any such
20  action of that nature, your Honor, not even an arrest
21  or a dismissal for that.  So, we -- we do believe he
22  can appear in court, and there are some conditions.

23      Another condition that the Defendant would be
24  willing to abide by is maintaining employment.  It
25  does show here that he was working, I believe, for

1  Permian Rod.  And I would just proffer to the Court

2  again, your Honor, that he can obtain that job upon

3  release.

4      (Cough.)  Excuse me.

5      Another condition that he would be willing to

6  abide by is if the Court wanted to put a monitoring --

7  a monitoring device on him, we would be willing to go

8  with a condition like that.

9      I'd just remind the Court that it's easier to

10  defend a case of this nature if the Defendant is on

11  release.  Of course, that's true in any case, your

12  Honor, but I would just like to remind the Court of

13  that, also, for defense counsel, maybe, more than

14  anything.

15      But, again, we believe that he has strong ties to

16  this community.  He has his family there.  His wife is

17  willing to look out for him.  He doesn't have that

18  lengthy of a criminal history.  And we believe those

19  factors would allow him to -- to be released upon a

20  certain amount of conditions.

21          THE COURT:  Is Mrs. Brunson here today?

22          MR. CASTILLO:  She was, your Honor.  But, I

23  mean, I would just, again, proffer to the Court that

24  she informed me before court that she was really,

25  really nervous, and she didn't want --

1  THE COURT:  No, I just -- I just wondered if

2  she was here.

3  MR. CASTILLO:  -- and didn't want to say

4  anything that would hurt herself.

5  THE COURT:  I understand.  With the crowd

6  here, I couldn't tell if she was or not, because I

7  don't know what she looks like.

8  Thank you.

9  MR. CASTILLO:  Thank you, your Honor.

10  THE COURT:  Thank you, Mr. Castillo.

11  Anything further, Ms. Fleck?

12  MS. FLECK:  No, your Honor.

13  THE COURT:  Okay.  Mr. Brunson, if you'll

14  take the podium with Mr. Castillo.

15  I take judicial notice of the Pretrial Services

16  report and the complaint, along with the affidavit

17  supporting that complaint.

18  I find that -- You know, we've parsed through

19  the -- the statute a little bit today.  I find that

20  probable cause does exist to believe that an offense

21  was committed in violation of 2251(b), and that you

22  are the person that committed that offense.  So, I

23  find that probable cause exists to bind the case over

24  to the Grand Jury.

25  And, again, as I have alluded to several times

1 today, you know, I don't know what the indictment --

2 If an indictment ensues or is returned, I don't know

3 what that will look like, if it will -- if it will

4 reflect much of what you see in the complaint.  But

5 whether it does, or if it adds other things, that will

6 be a whole different story.  And the Grand Jury, you

7 know, may decide to no bill the case.  But for now I

8 find probable cause exists.

9      As for detention, Mr. Brunson, you -- there is a

10 rebuttable presumption.  I know -- I do not believe

11 that you have rebutted sufficiently the presumption

12 that tells me, by statute from Congress, that you are

13 a flight risk and a danger to the community.

14      There are lots of things that your attorney

15 has -- has brought to mind that are -- are very good.

16 And I -- I note that Mrs. Brunson was in the home when

17 these alleged -- some of these alleged acts were

18 taking place, and so I don't -- I don't find a whole

19 lot of comfort in Mrs. Brunson being able to -- to be

20 your custodian of any kind.

21      And I don't think electronic monitoring -- I

22 can't think of -- I like the fact that you have a job.

23 And those are tough to come by these days for a lot of

24 people, and I respect people that do that.

25      But I -- I don't think that -- I can't fashion,

1  in my mind, conditions, or even a combination of

2  conditions that would ensure that you are not a flight

3  risk and -- and that you are not -- that you are not a

4  danger to the community, that would ensure the safety

5  of the community.

6      You are facing, at this point, with the charge

7  that you now are under, I think 15 to 30 years in

8  prison.  And -- And that is a lot of time.

9      I find that the evidence against you is

10  substantial, and that there is a likelihood of

11  conviction.  And, so, I take that into consideration,

12  as well.  And I think that makes a lot of difference

13  to me in trying to determine if we could fashion some

14  conditions to ensure your return, and the safety of

15  the community, and I cannot come up with that.

16      I also find that your criminal history -- I agree

17  with your attorney, your criminal history is not

18  atrocious, that I see.  I see some things; I do see

19  that you had a probation revoked, which doesn't give

20  me any comfort, either.

21      So, I will order you detained pending the outcome

22  of the case.

23      And, Mr. Castillo, do you have anything further?

24          MR. CASTILLO:  No, we don't, your Honor.

25          THE COURT:  And, Ms. Fleck, anything from

1    the Government?

2              MS. FLECK:  No, your Honor.

3              THE COURT:  All right.  Mr. Brunson, you

4    will be remanded to the custody of the marshals

5    pending the outcome of your case.

6              THE DEFENDANT:  Yes, sir.

7              MR. CASTILLO:  Thank you.

8

9                   (Recess.)

10

11                 ************

12

13

              I, Court approved transcriber, certify that the
14    foregoing is a correct transcript from the official
      electronic sound recording of the proceedings in the
15    above-entitled matter.

16

      /s/ Darla Messina                    June 29, 2010
17    Signature of Approved Transcriber    Date

18

19    Darla Messina
      Typed or Printed Name
20

21

22

23

24

25